[No. A110913. First Dist., Div. One. July 12, 2007.]

MICHAEL DiPIRRO, Plaintiff and Appellant, v.
BONDO CORPORATION, Defendant and Appellant.

COUNSEL

Dell'Ario & LeBoeuf, Jacques LeBoeuf; Chanler Law Group and Clifford A. Chanler for Plaintiff and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Tom Greene, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Edward G. Weil and Susan S. Fiering, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Nossaman, Guthner, Knox & Elliott, Carol René Brophy, Patrick J. Richard and Deborah E. Beck for Defendant and Appellant.

OPINION

**SWAGER, J.**—Plaintiff Michael DiPirro (DiPirro) filed a complaint against defendant Bondo Corporation (Bondo) seeking enforcement of the provisions of the Safe Drinking Water and Toxic Enforcement Act of 1986 (the Act) (Health & Saf. Code, §§ 25249.5–25249.13).[1] The action was bifurcated, and respondent's defense of a statutory exemption from the warning and enforcement provisions of the Act (§ 25249.10, subd. (c)) was first adjudicated before the court, sitting without a jury.[2] The court found that Bondo's product is exempt from the warning requirements of the Act, and entered judgment in favor of Bondo. Bondo's subsequent request for attorney fees was denied.

DiPirro claims in his appeal that he was denied the right to a jury trial, and the trial court erred by finding that respondent established the warning exemption. Bondo appeals seeking reversal of the trial court's denial of its motion for attorney fees pursuant to Code of Civil Procedure section 1021.5. We conclude that DiPirro was not entitled to a jury trial on Bondo's affirmative defense that warnings under the Act were not required, and the trial court's finding that Bondo established the warning exemption is supported by substantial evidence. As to Bondo's appeal, we conclude that the denial of its motion for attorney fees was properly based upon a finding that it did not vindicate an important public right or confer a significant benefit on the general public within the meaning of section 1021.5. We therefore affirm the judgment.

---

[1] The Act, which we will also refer to by its commonly known name of Proposition 65, was adopted by the voters in the November 4, 1986 General Election. (*Consumer Cause, Inc. v. Weider Nutrition Internat., Inc.* (2001) 92 Cal.App.4th 363, 365 [111 Cal.Rptr.2d 823].)

All further statutory references are to the Health and Safety Code unless otherwise indicated.

[2] The statutory exemption under section 25249.10, subdivision (c), has been referred to as the "warning exemption," and we will use the same term here. (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 367 [15 Cal.Rptr.3d 430].)

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Bondo manufactures and sells exclusively to "auto makers" a product in 0.44-fluid-ounce bottles that is used for "touch-up" painting of motor vehicles.[3] The paint contains the industrial solvent toluene, which in 1991 was listed in the Act as a reproductive developmental toxin (§ 25249.8, subds. (b), (c)). (Cal. Code Regs., tit. 22, § 12000.) The designation of toluene as a chemical known to cause reproductive toxicity triggered the mandate of Proposition 65 that "No person in the course of doing business shall knowingly and intentionally expose any individual" to the chemical "without first giving clear and reasonable warning to such individual, except as provided in Section 25249.10."[4] (§ 25249.6.) Bondo has always been aware that its touch-up paint contained the listed chemical toluene. Since at least 1997, Bondo placed "Proposition 65 warnings" on its "Material Safety Data Sheets" included with wholesale shipments of the touch-up paint to automobile manufacturers, but no warnings were placed on the individual paint bottles.

On November 30, 2001, DiPirro filed a complaint for injunctive relief and civil penalties against Bondo that alleged violation of the Act through the manufacture and distribution of touch-up paints containing toluene without the required "clear and reasonable warnings" of reproductive toxicity.[5] DiPirro requested relief in the nature of an injunction to prohibit Bondo from selling or distributing the touch-up paints without the required warnings, civil penalties, and restitution, along with attorney fees.

■ Bondo answered the complaint with a general denial and numerous affirmative defenses, including the seventh affirmative defense which alleged that any exposure to toluene that occurs as a result of reasonably anticipated use of its touch-up paint products poses " 'no significant risk' of causing cancer or reproductive toxicity to users of those products, within the meaning of Health and Safety Code § 25249.10(c)." Subdivision (c) of section 25249.10 grants a warning exemption for products with listed chemicals if the defendant proves an exposure level 1,000 times less than the maximum specified dose level at which a chemical has no observable reproductive effect (Cal. Code Regs., tit. 22, § 12801, subd. (c)).[6]

---

[3] The paint is then presumably passed on to consumers who buy and own cars, although Bondo does not market or sell to consumers.

[4] A "person" includes a company or corporation. (§ 25249.11, subd. (a).)

[5] The complaint also included as Doe defendants the distributors and retailers of the touch-up paints manufactured by Bondo.

[6] "Section 25249.10 provides three bases for exemption from the section 25249.6 warning requirement: '(a) An exposure for which federal law governs warning in a manner that

The parties stipulated to bifurcation of the proceedings, "with the trial of issues relating to Bondo's seventh affirmative defense—which may be dispositive—to be tried first." Thereafter, upon motion by Bondo the trial court struck DiPirro's demand for a jury trial.

The trial then proceeded before the court primarily on the basis of the declarations and testimony of experts.[7] The undisputed evidence established that for inhaled toluene the exposure level of the warning exemption of section 25249.10, subdivision (c), is set at 13,000 micrograms per day. The focus of the trial was upon studies, tests and surveys concerning the nature and level of exposure to toluene by persons using Bondo's touch-up paints.

Evidence was presented on the essential nature and effects of toluene. Toluene is an aromatic hydrocarbon often used as a solvent that is found in gasoline, paint products, cosmetics, adhesives, and inks. Toluene promotes the flow and coating of pigments onto a surface, then evaporates and dries quickly, even at cold temperatures and high humidity. Exposure occurs as the result of airborne inhalation of the chemical through the bloodstream. The primary toxic effect of toluene is neurotoxicity. At very high concentration levels toluene may have a narcotic impact upon the central nervous system to produce "giddy" behavior. At "lower doses," toluene has an effect on *reproductive developmental* processes in the body. According to studies on animals, gestational exposure to the chemical at particular stages of development of a fetus may cause identified anomalies: intrauterine growth retardation, premature delivery, low birth weight, retarded skeletal development, kidney abnormalities, congenital gastrointestinal, urogenital, central nervous system, craniofacial, and cardiac malformations, along with postnatal interruptions in neurobehavioral development.[8] The evidence of *developmental* toxicity of toluene in humans is limited, but strongly indicates adverse effects upon fetus development resulting from toluene abuse by pregnant women. The evidence does not indicate *maternal* toxicity of toluene in humans.

---

preempts state authority. [¶] (b) An exposure that takes place less than twelve months subsequent to the listing of the chemical in question on the list required to be published under subdivision (a) of Section 25249.8. [¶] (c) An exposure for which the person responsible can show that the exposure poses no significant risk assuming lifetime exposure at the level in question for substances known to the state to cause cancer, and that the exposure will have no observable effect assuming exposure at one thousand (1000) times the level in question for substances known to the state to cause reproductive toxicity . . .' " (*Ingredient Communication Council, Inc. v. Lungren* (1992) 2 Cal.App.4th 1480, 1484, fn. 2 [4 Cal.Rptr.2d 216].) The exemptions found in subdivisions (a) and (b) of section 25249.10 are not at issue in this case.

[7] Two experts testified at trial, one for each party, and the remaining evidence was presented in the form of declarations.

[8] The association between prenatal exposures to toluene and developmental toxicity in humans is compromised by the potentially "confounding effects of other fetotoxic agents" to which pregnant women may be exposed.

By 1990, the California Department of Health Services decided to list toluene as a reproductive developmental toxicant under Proposition 65. In 1991 toluene was "placed on the safe harbor list" of chemicals known to cause reproductive developmental toxicity. A "safe harbor" or "maximum allowable dose level," the "MADL," of 13,000 micrograms per day—below which the warning requirements of Proposition 65 are not triggered—was established for toluene by multiplying the figure of 7,000 micrograms per day of *ingested* toluene by nearly twice, to account for the 50 percent rate of absorption of an *inhaled* chemical. (§ 25249.10, subd. (c); Cal. Code Regs., tit. 22, §§ 12801, subds. (a), (b)(1), (c), 12803.) The MADL is the level at which no observable reproductive developmental effects will occur upon exposure to the chemical at a level 1,000 times higher. (Cal. Code Regs., tit. 22, §§ 12801, subds. (b)(1), (c), 12805.)

■ The remaining evidence offered at trial dealt with the tested levels of exposure to toluene that result from use of Bondo's touch-up paint. The formula for calculating or quantifying exposure is rather simple and straightforward. As the experts agreed, the implementing regulations specify that for purposes of section 25249.10, subdivision (c), the level of exposure to a listed chemical that causes reproductive developmental toxicity must be determined by multiplying the measured concentration level of the chemical in the product—in this case, the amount of toluene in a unit of air—times the inhalation rate, times the duration of exposure. (Cal. Code Regs., tit. 22, § 12821, subd. (b).) The regulations specify that for toluene the inhalation rate is 20 cubic meters per day, or 0.833 cubic meters per hour, for a "woman with conceptus."

The calculation becomes more complex, however, when measuring the inhalation of a chemical like toluene during use of a consumer product like Bondo's touch-up paint. The level of toluene in the "breathing zone" around the head must be measured, along with the amount that is then exhaled. The rate of breathing and level of intake per unit of time must be taken into account. Both the immediate, more acute exposure and the cumulative exposure "over time" must be measured. The rate of dilution and dispersal of the chemical into the air must be known—for instance, toluene evaporates into the air "very rapidly," within minutes. Any testing must also consider the manner in which the product is used, including the directions for use that accompany the product. All the potential sources of toluene from the touch-up paint must be measured: the gas diffusing out of the bottle; the amount emanating from the area on which the paint is being applied; the exposure from any other areas that have been "just painted"; and the paint on the wand or brush. Thus, a "very detailed protocol" must be established in testing to account for these factors.

Only scientifically approved methods and procedures may be followed to quantify an exposure under the Act. A hierarchy of accepted methodologies has been established by the California Department of Health Services (CDHS). The parties agreed that the "appropriate sampling protocol for assessing toluene concentration in the air is NIOSH[9] 1501," the "top-tiered method" established by the CDHS for toluene exposure testing. The parties' experts both reviewed existing studies and performed numerous tests under various conditions to measure exposure to toluene from use of Bondo's touch-up paints in accordance with the NIOSH 1501 protocol. The results of the surveys and testing present evidence that is conflicting, but fall within certain defined parameters.

Bondo's expert in the field of toxicology, human health risk and exposure assessment, Dr. Michael Lakin, compiled and reviewed surveys of the reasonably anticipated use of automotive touch-up paints to determine exposure conditions. Dr. Lakin concluded, based upon his review of the studies and expert depositions provided to him, that the "great majority" of consumers use touch-up paint sparingly for only a few small nicks or scratches, outside or in an open garage, complete the painting process within a minute, then immediately reseal the container and move away from the vehicle once painting is completed.

Tom Shellworth, the owner of an automobile dealership in Vacaville for the past 16 years who had often personally used touch-up paint and observed "countless applications of touch-up paint by dealership personnel and outside vendors,"[10] in addition to inspecting "thousands" of "touch-up repairs" performed upon vehicles by consumers, essentially agreed with Dr. Lakin's characterization of the customary nature of the use of touch-up paint. Shellworth offered his opinion that the "vast majority" of consumers do not ever use touch-up paint, or if they do, make limited use of the paint for one or two chips for "about 10 seconds." Shellworth also stated that due to the variation in use of touch-up paint, description of the "average or typical" extent of repair was difficult. In his testimony Shellworth did not refer to the conditions under which touch-up paint is applied, other than to very generally assert that it was used both inside and outside.

In an attempt to describe the use of touch-up paint by consumers Bondo presented the results of a survey distributed by its counsel to car dealerships in California—referred to as the "Nossaman survey." The survey enlisted assistance from car dealerships in the form of responses to inquiries about the "average" or "typical" use of touch-up paint. A cover letter that accompanied the survey advised the dealerships of Bondo's defense of a "Proposition 65

---

[9] National Institute for Occupational Safety and Health.

[10] Shellworth had not observed *consumer* applications of touch-up paint.

lawsuit" filed by a "bounty hunter," DiPirro, and the intended "meritless" "follow-up lawsuits" against dealerships and others in the industry. The letter also mentioned the specific need to prove that "touch-up paint does not expose the average consumer to levels of toluene and other chemicals that exceed 13,000 micrograms per day."[11] A summary of the responses, more than 300 in number, indicate that the paint is typically applied in one or two coats of paint to a few small chips or scratches of less than an inch in length by a service person at the dealership, usually outside or less often in the service bay, for between five seconds and a minute. Most consumers who purchase touch-up paint never use it, and if they do the quality of the work is poor. The dealerships also noted in their responses that a small number of consumers used the paint inappropriately for larger scratches or chips.

DiPirro's expert criticized the partiality of the Nossaman survey, suggesting that it was obviously conducted and structured as a response to an "adversarial situation." He asserted that the results of the Nossaman survey were skewed by the improper "target population" of car dealerships rather than "the average consumer," and the nature of the questions.[12]

DiPirro also conducted an "on-line consumer survey" of touch-up paint use, referred to as the "Cooper-Roberts survey." Three hundred fifty-three (353) responses to questions were received, which were compiled into a summary of the nature of use of touch-up paint by average consumers: about 74 percent used the paint once a year or less; 88 percent used the paint only on one vehicle; only 21 percent of the use occurs in a covered carport or in a garage; less than half of the people used the paint on scratches; nearly half of the people who painted a scratch on their car from a key had a scratch one foot long or more; 70 percent applied the paint to three or fewer scratches; 80 percent painted three or fewer nicks; 80 percent used less than one-quarter of the bottle; typically the paint was applied by dipping the wand into the bottle one to two times per application; 81 percent expressed no health concerns associated with use of the paint.[13]

Bondo offered evidence of practical field tests of toluene exposure from James Embree, the principal toxicologist for the environmental sciences and engineering consulting firm Geomatrix Consultants, and an expert in the field

---

[11] The dealerships were also informed that defense experts had already determined the level of exposure to toluene in touch-up paint "is 1/20th of the amount that would trigger a warning" under Proposition 65, and of the Attorney General's advice to DiPirro that his claim "is without merit."

[12] The trial court determined that the results of the Nossaman survey did not comply with valid market research standards due to the biased nature of the cover letter, and we agree, although it nevertheless provides at least some useful information.

[13] The inquiries did not solicit information on the total length of time spent painting or whether the painter remained near the paint while it dried.

of "Proposition 65-required methods for determining exposures to listed chemicals." In 2003, Dr. Embree designed, supervised and reviewed a series of three "touch-up paint application tests," referred to collectively as the "Geomatrix Paint Application Study" (Geomatrix Study), to measure the exposure to toluene of an "average consumer" of Bondo's touch-up paint under "conservative and varied 'real world' conditions." The tests followed some accepted assumptions, protocols and methodologies related to toluene exposure from touch-up paint, including the NIOSH 1501 first-tier method of analysis, and were implemented with "a series of actual-use measurements" based on "conservative factors" of application. The touch-up paint used was one with approximately 27.5 percent toluene, which is "toward the upper limit of toluene routinely used in Bondo touch-up paint."

Three tests in the 2003 Geomatrix Study measured exposure in varying environments under different conditions. The first test: in a three-car open garage, with four painted surfaces attached to the sides of a car, each about one-half inch square, and each painted for three and one-half minutes, followed by the painter remaining within several feet of the car for another 15 minutes, for a total of 30 minutes of exposure. The second test, comparable to the first, but conducted in a two-car garage, and with the addition of two more scenarios with the garage door closed: one with painting of a "ding approximately 1/8 to 1/4 inch in diameter and 3 one-inch scratches, and the other to touch-up a one-half square inch area." The third test: conducted in a one-car open garage, with the application of paint to "one 6-inch scratch" and "three dings" as indicated in the results of DiPirro's Cooper-Roberts survey of the "reasonably anticipated rate of exposure" for the "average users" of the product, with the added assumptions of application of two coats over an eight-minute period, seven minutes for each coat of the paint to dry while the painter remained in the area of the car, for a 30-minute total period of exposure. In each of the three studies, one collection tube was placed in the painter's breathing zone as the NIOSH 1501 method requires, and a second or "back" tube collected samples from ambient air that may have "gone through the first tube." Due to the greater area painted and the longer duration of painting, Dr. Embree opined that measured concentrations were far higher than any reasonably anticipated use by the average consumer, so the conditions of testing assured results in excess of any likely consumer exposure. However, the airflow rates were twice that specified in the NIOSH manual.

All the samples collected during the three tests were sent to an approved laboratory for detection of the concentration of toluene in accordance with the NIOSH 1501 method. No evidence of "blow-by" or "breakthrough" of chemicals from the first breathing tubes was found in the second sampling tubes. Exposure levels were then calculated from the measured concentration results of the tests according to the "Proposition 65 specified formula" for toluene: multiplication of the concentrations, times the specified inhalation

rate, times the conservative 30-minute period of exposure. Even without adjustment for averaging over a 270-day gestation period, all three of the tests conducted for the 2003 Geomatrix Study indicated exposure levels substantially below—only 0.4 to 16 percent of—the MADL for toluene of 13,000 micrograms per day.[14] Averaging the exposure over a nine-month gestation period resulted in calculated levels between 0.002 and 0.06 percent of the MADL, or 1,700 to 65,000 times less than the MADL.

The Geomatrix Study was repeated in 2004, with slight variations in the conditions of application of paint to account for objections to the 2003 study. Three additional tests were done: one with the vehicle in a garage with the door closed, another with the garage door open, and a third with the vehicle in the driveway just outside an open garage. The painted test panels were confined to one side of the car, and ranged in size from one-quarter- to one-half-inch dings to a "6-inch by 1/4-inch scratch." Two coats of paint were applied, with a five-minute interval between coats,[15] and a waiting time following the conclusion of painting, for a total exposure duration of 28 minutes. The air temperature was lower than the 2003 test, which resulted in theoretically slower evaporation, but the humidity was slightly higher. A new paint container was used for each test, and the weight of the paint used during each test was calculated, unlike the prior study. Airflow rates were half that used in the 2003 Geomatrix Study, 0.2 liters per minute as approved in the NIOSH manual. Again, the tested exposure levels of toluene in all three tests were far below the MADL, and even "slightly lower" than in the 2003 Geomatrix Study.

Dr. Lakin performed his own "EnSIGHT Study" for Bondo to quantify exposure to toluene from touch-up paint. In doing so, he consulted the measured data and analytical methods from the "Nail Polish study"[16] conducted by Clayton Engineering for the Attorney General's Office using protocols developed by the CDHS. He considered the Nail Polish study "acceptable for this purpose" due to the "great similarity in use and composition of nail polish and touch-up paint." A distinction in the Nail Polish study is that the CDHS-approved Method 4000 protocol was used, which is similar to the tier-one NIOSH 1501 protocol, with the only modification being the use of a badge with charcoal on it to absorb the air rather than drawing the air through a tube. Dr. Lakin testified that the two methods are "equally efficient" at detecting exposure, and DiPirro's expert agreed that the two methods are "equivalent."

---

[14] That is, 58 to 2,042 micrograms per day.

[15] In one test the technician briefly left the garage and returned, but the calculations were corrected to account for the time lost.

[16] This study was contracted for and supervised by the Office of the Attorney General to evaluate exposures to toluene and formaldehyde in nail polish.

In the Nail Polish study the exposure to toluene by both the manicurist and customer were measured from over 500 samples collected under varied conditions, with the customer monitored only for the duration of the appointment—about one hour—while the manicurist was monitored for the entire workday. The average concentration of toluene in the samples was then multiplied by the amount of air breathed by the person during the time present in the salon. Even upon application of a "more conservative inhalation rate"—that is, a higher rate than the actual level—and without adjusting for exposure over the nine-month gestation period, the exposure results of the Nail Polish study were below the MADL figure: 570 micrograms per visit for the customer, and 9,023 micrograms per workday for the technician.

Dr. Lakin asserted that the Nail Polish study was conducted in compliance with tier-one testing methods and protocols that have the requisite wide acceptance of reliability within the scientific community. He also found that the data from the Nail Polish study provided a "representative and conservative basis" for the evaluation of the "reasonably anticipated" consumer exposure to toluene in the present case. He noted that some environmental factors associated with the application of nail polish—specifically, use of the product indoors, with fewer air exchanges, and at lower temperatures and humidity levels—resulted in more conservative, higher exposure levels than the conditions which accompany use of touch-up paint.[17]

Dr. Lakin also gathered information from other studies on the range of exposures to touch-up paint. Finally, he reviewed the Geomatrix Study of Dr. Embree, which he found to be consistent with "standard guidance, procedures and methodologies recognized and accepted by experts in the field," and in compliance "with 22 C.C.R. § 12901(b)." According to Dr. Lakin the results of the Geomatrix Study, which he reiterated are "entirely consistent" with the findings of the Nail Polish study, provide a "sound technical basis for evaluation of exposure" to toluene.

Using the "extremely conservative values" from the Nail Polish study that are "more health protective," along with the Geomatrix Study results and other data from scientifically accepted practices, some of it provided by DiPirro, Dr. Lakin calculated an exposure concentration of toluene in the EnSIGHT Study that encompassed all but a "very small proportion of the users of touch-up paint." His calculation of exposure included consumers of touch-up paint who used the paint indoors, in an area with a very high background level of toluene, applied two or three coats of paint to the equivalent of 60 nicks and 60 scratches, for a total of about 30 minutes. He

---

[17] The Nail Polish study results were used as a basis for the finding in *Toxic Injuries Corp. v. Creative Nail Salon* (Super. Ct. L.A. County, Aug. 4, 2000, No. PC023239X) that the exposure of nail polish consumers to toluene does not exceed the MADL.

used the inhalation rate established in the Proposition 65 regulations, and the concentration level measured in the Nail Polish study that he believed was "overly conservative when compared to the application of touch-up paint." The result was an exposure concentration level higher than "any reasonably foreseeable circumstances for the average consumer."

Dr. Lakin thereby arrived at a "bounding estimate" or "bounding study," which is an approach of risk assessment used to determine the exaggerated "upper end or extreme estimate of the population" that is "above what most of the population would actually receive," and constitutes a "very rare event." He found that the reasonably anticipated exposure to toluene of the average user of touch-up paint is no more than 75 micrograms per day, "unadjusted for exposure over the nine-month gestation period," and only 0.3 micrograms per day when divided by the 270-day gestation period. Both figures are "well below the MADL." He added that even DiPirro's "own testing results" obtained during a 41-minute exposure test show exposure of 2,991 micrograms per day, or less than 25 percent of the MADL, without adjustment for the nine-month gestation period.

DiPirro relied heavily on declarations and testimony from Dr. David Brown, a public health toxicologist who is a qualified expert on human exposures to toxic chemicals from a variety of sources. Dr. Brown offered the opinion that "it is inappropriate to use the nine months of gestation as the basis for averaging to derive a pregnant woman's reasonably anticipated rate of exposure." He stated that according to current studies toluene "produces teratogenesis," but not as a "frank teratogen," rather as a "neurodevelopmental toxin." Toluene produces impacts upon the "sensitive developmental processes" of the fetus during "short-term exposures" that may not be repaired or overcome during subsequent stages of development. Thus, he maintained that "there is sufficient human and animal evidence in the literature to support that birth defects occur with short-term exposures," and even in "one hour's worth of exposure it is possible that damage could be elicited from which the organism cannot recover."

Dr. Brown expressed concern with the methodologies used in the Geomatrix Studies. His primary criticisms were the lack of control or knowledge of the air "exchange rates" during exposure, and the failure to explain protocols in detail. He particularly disapproved of the use of the 0.4-liters-per-minute airflow rate in the 2003 Geomatrix Study, twice that required by the NIOSH 1501 methodology. Dr. Brown did not find any information in the scientific literature to suggest that a flow rate of 0.4 liters per minute is an appropriate or acceptable method to assess inhalation of toluene. He testified that the "higher flow rate" causes the "sample to become overloaded and blow by," thereby reducing the amount of chemical absorbed in the sampling tube, and

resulting in "underestimation" of the "exposure in the breathing zone." He added that the 2003 Geomatrix Study did not account for the greater airflow rate by properly placing a second tube "at the end of the first tube" to measure with sensitivity any amounts of toluene that bypassed the first chamber. Dr. Brown acknowledged that a second sampling tube was used in the 2003 Geomatrix Study, but he could not "easily figure out exactly" from his review of the study how the tests were configured to report the amount collected in the second tube.

Dr. Brown further expressed dissatisfaction with some aspects of Dr. Embree's methodology: the use of the "same person" to do all the painting "throughout the process," the location of the painted devices attached all around the car, the insufficient sampling number, the brief departure of one of the technicians during sampling, the dilution of peak values of exposure by sampling over a "set time period," the failure to take into account the elevated breathing rate—a quarter to a half higher than the default number—of pregnant women, the use of a figure of 25 percent volume of toluene rather than 30 percent, and the failure of the Geomatrix investigators to "chemically measure the amount of toluene" in the touch-up paint bottles or the amount of paint used for each test. He opined that the Geomatrix Study did not comply with "accepted scientific methodology," and therefore failed to accurately "characterize a consumer's exposure to toluene when using touch-up paint under reasonably foreseeable conditions."

Dr. Brown also disapproved of any reliance by Dr. Lakin upon the results of the Nail Polish study "for assessing a consumer's exposure to toluene using automotive touch-up paint." He stated that the Nail Polish study did not follow the NIOSH 1501 protocol "in its entirety," specifically in the use of a "passive badge" to collect the chemical rather than an "active sampling method" such as a pump to draw air into the sampling tube. He noted several other factors that he believed undermined the credibility and "appropriateness of using the Nail Polish study to infer exposures similar to those experienced by a consumer applying touch-up paint" in a garage: the absence of testing for "potentially interfering compounds" likely to be in the air in a nail salon; the lack of equivalent air exchange rates in a nail salon and a garage; the differences in environmental factors between a nail salon and a garage or driveway; and potential "hydrocarbon interferences" in a salon that "differ from those encountered in a residential garage."

Dr. Brown devised his own exposure study that was conducted by Air Quality Sciences, Inc., an independent testing laboratory. Dr. Brown's evaluation used two environmental test chambers that he claimed met the requirements of section 12901 of the regulations: a "Large Chamber" study and a "Small Chamber" study.

The Large Chamber study was designed by Dr. Brown to measure exposure based upon "realistic" parameters of application: three coats of touch-up paint used in a small area—less than the size of a one-car garage—upon a Plexiglas test fixture divided into a one-inch square and further divided into four equal quarters; painting of the equivalent of "several small scratches," with allotted time of five minutes to wait for the paint to dry between coats at a distance of 20 to 24 inches while the bottle was closed; a total exposure time of 41 minutes. The environmental test chamber controlled the variables of exchange rates, background contaminants, humidity and temperature. The chemical content of each bottle of paint was determined, and the weight of the bottle was measured and tested for toluene content before and after each application. The airflow rate was 0.2 liters per minute, as approved in the NIOSH 1501 tier-one method. Samples of toluene exposure were collected from multiple charcoal sampling tubes draped around the mouth, nose, and chest of the painter. Dr. Brown asserted the results provided a "lower bound estimate of 'real' exposure," of approximately 3,000 micrograms per day, or about one-quarter of the MADL.

The Small Chamber study collected air in essentially the same manner, but in a chamber the size of a breadbox at the application site around the painter's head to "fully assess" and quantify the magnitude of concentration of toluene during "spikes" of peak exposure while painting. The Small Chamber study was designed to simulate exposure immediately around the painter's head while working in very close proximity to the brush or wand, without dissipation of the chemical into the air, at "discrete time intervals while using the product." A 12-inch key scratch was painted, which was an average size based upon the results of the Cooper-Roberts online survey performed for DiPirro. Dr. Brown agreed that the Small Chamber study "wasn't realistic," but instead was a method of "getting another piece of information" on the "values in the breathing zone" during "sporadic or episodic exposures." From the results of the Small Chamber study, he concluded that exposure levels of toluene would exceed the MADL.

The results Dr. Brown obtained in the Small Chamber study, along with his extrapolations from the 2003 Geomatrix Study, indicated to Dr. Brown that within the range of measurable exposures is the "possibility a person could be exposed to levels that exceed the California MADL" at "various levels of use." He submitted two conclusions as to the exposure to toluene from touch-up paint: first, that toluene may produce neurological damage from "short-term episodic exposures" rather than "chronic dosing" over time; and second, that "a consumer, at various levels of use, will be exposed to levels of toluene that exceed the MADL."

Dr. Lakin testified for Bondo that many of Dr. Brown's extrapolations and assumptions were flawed. Primarily, Dr. Lakin challenged the assumption that "peak exposure at some point in time" is an appropriate measure for an assessment of the MADL of toluene. He testified that under Proposition 65 the "total exposure per day over the amount of time the exposure may occur" is the correct measurement, "not parsing it out." Dr. Lakin explained that the NOEL (no observable effect level) and MADL figures for toluene are set according to animal studies of effects from ingestion that are related to daily intake, not momentary peak exposure. Further, he asserted that the sampling by Dr. Brown at discrete, isolated distances from the source that have changing concentrations at different points in time is not a reliable test of real exposure.

The trial court accepted the testimony and test results of Bondo's experts. In determining the exposure of an average consumer, the court accepted a model that included 75 to 85 percent of the users of touch-up paint. No single test presented by the parties' experts was found determinative, but the court relied upon the tests to determine "bounding estimates" to find an exposure level below which average consumers will not be at risk. Based primarily on the results of the 2003 and 2004 Geomatrix Studies, the court found that Bondo "met its burden of proof establishing that the exposure to average users of automotive touch-up paint as used in a reasonably foreseeable manner poses no significant risk as the exposure level falls below the MADL" of 13,000 micrograms per day. These appeals followed.

## DISCUSSION

### I. *The Denial of DiPirro's Request for a Jury Trial.*

DiPirro challenges the trial court's order that granted Bondo's motion to strike the demand for a jury trial. After Bondo's seventh affirmative defense was ordered to be tried first, Bondo moved to strike DiPirro's request for a jury trial of the "Phase 1 Issues." DiPirro opposed the motion, based upon the argument that the Phase 1 "narrow factual question of whether plaintiff can show a detectable exposure to toluene and, if so, whether the exposure is low enough to exempt Bondo from providing a warning," was "not equitable in nature," and therefore "must be considered by a jury." The court found that "the gist" of DiPirro's action "is equitable," and therefore no right to a jury trial existed. DiPirro complains that the Phase 1 issue of the section 25249.10, subdivision (c), "warning exemption" was "never available in courts of

equity, did not turn on the exercise of equitable principles, and was not committed to the trial court's discretion." He therefore argues that he was "entitled to a jury trial to resolve this purely legal issue."

## A. *The Waiver of the Right to a Jury Trial.*

We first confront Bondo's contention that DiPirro waived his right to a jury trial of the Phase 1 issues related to the warning exemption. Bondo maintains that a jury trial waiver is found in DiPirro's opposition to the motion to strike the request for a jury trial, in which he "concedes that any penalty that may be imposed and any injunctive relief ordered shall be determined by a Court, not a jury." Bondo's position is that DiPirro thereby acknowledged "he wasn't entitled to a jury trial of Phase 1 issues," and "waived any right to appeal the trial court's determination." Bondo also contends that DiPirro "waived his right to assert error on appeal" by failing "to appear at the hearing to contest the court's tentative ruling on Bondo's motion to strike."

■ "The California Constitution guarantees the right to a jury trial in a civil action at law." (*Salisbury v. County of Orange* (2005) 131 Cal.App.4th 756, 764 [31 Cal.Rptr.3d 831].) Pursuant to article I, section 16 of the California Constitution, trial by jury is " 'an inviolate right,' " " 'a basic and fundamental part of our system of jurisprudence. . . . As such, it should be zealously guarded by the courts . . . . In case of doubt therefore, the issue should be resolved in favor of preserving a litigant's right to trial by jury.' [Citation.]" (*Cohill v. Nationwide Auto Service* (1993) 16 Cal.App.4th 696, 699 [19 Cal.Rptr.2d 924]; see also *Johnson-Stovall v. Superior Court* (1993) 17 Cal.App.4th 808, 810 [21 Cal.Rptr.2d 494].) " 'In light of the importance of the jury trial in our system of jurisprudence, any waiver thereof should appear in clear and unmistakable form.' Where it is doubtful whether a party has waived his or her constitutionally protected right to a jury trial, the question should be resolved in favor of preserving that right." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 804 [79 Cal.Rptr.2d 273]; see also *Conservatorship of Kevin M.* (1996) 49 Cal.App.4th 79, 92 [56 Cal.Rptr.2d 765].)

Our California Constitution, article I, section 16 mandates in part that "Trial by jury is an inviolate right and shall be secured to all . . . . In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." Code of Civil Procedure section 631, subdivisions (a) and (d) provide in part: "In civil cases, a jury may only be waived pursuant to subdivision (d). [¶] . . . [¶] (d) A party waives trial by jury in any of the following ways: [¶] (1) By failing to appear at the trial. [¶] (2) By written consent filed with the clerk or judge. [¶] (3) By oral consent, in open court, entered in the minutes. [¶] (4) By failing to announce that a jury is required,

at the time the cause is first set for trial, if it is set upon notice or stipulation, or within five days after notice of setting if it is set without notice or stipulation. [¶] (5) By failing to deposit with the clerk, or judge, advance jury fees as provided in subdivision (b). [¶] (6) By failing to deposit with the clerk or judge, at the beginning of the second and each succeeding day's session, the sum provided in subdivision (c)."

■ Thus, "As a matter of constitutional right [DiPirro] was entitled to a jury unless he 'waived such right in the manner prescribed by law' [citation]; 'the manner prescribed by law' specifically refers to the provisions for jury waiver in civil cases. They constitute the exclusive modes of waiver in civil cases. It has long been held in this state that a jury trial may not be waived by implication; it may only be waived affirmatively and in the manner designated by the provisions of section 631, Code of Civil Procedure." (*City of Redondo Beach v. Kumnick* (1963) 216 Cal.App.2d 830, 835 [31 Cal.Rptr. 367].) "And '[n]o waiver results from going to trial after the erroneous denial of a jury, if the party makes a proper objection.' [Citation.]" (*Cohill v. Nationwide Auto Service, supra*, 16 Cal.App.4th 696, 700.)

We would be hard pressed under any circumstances to find an express waiver of a jury trial right in DiPirro's *opposition* to a request to strike his demand for jury trial. As we read DiPirro's concession, it related only to the contingent issues of "any penalty that may be imposed" or any "injunctive relief ordered" by the trial court *following* the Phase 1 trial. DiPirro acknowledged that penalty and injunctive relief matters were equitable in nature, but argued that the trial of Bondo's "liability" under the Act "must be considered by a jury." We do not find that DiPirro's limited concession was a waiver of a jury trial of the Phase 1 part of the proceeding. The acknowledgement of the equitable nature of the penalty and injunctive relief issues expressed by DiPirro in his opposition to Bondo's request to strike a jury trial was not a "written consent filed with the clerk or judge" of a jury trial waiver within the meaning of Code of Civil Procedure section 631, subdivision (d)(2). No waiver of DiPirro's right to a jury trial occurred.

■ Nor do we find that DiPirro *forfeited* the right to challenge the ruling on the jury trial issue by failing to appear at the hearing on the motion to contest the trial court's tentative decision.[18] " '[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but

---

[18] Strictly speaking, "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.' [Citations.]" (*United States v. Olano* (1993) 507 U.S. 725, 733 [123 L.Ed.2d 508, 113 S.Ct. 1770].) Thus, "forfeiture" is the correct legal term to describe the loss of the right to raise an issue on appeal due to the failure to raise it in the trial court. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746]; *People v. Williams* (1999) 21 Cal.4th 335, 340, fn. 1 [87 Cal.Rptr.2d 412, 981 P.2d 42]; *Cowan v. Superior Court* (1996) 14

was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.' [Citation.] The critical point for preservation of claims on appeal is that the asserted error must have been brought to the attention of the trial court." (*Boyle v. CertainTeed Corp.* (2006) 137 Cal.App.4th 645, 649 [40 Cal.Rptr.3d 501]; see also *In re S.B., supra*, 32 Cal.4th 1287, 1293.) " 'It is unfair to the trial judge and to the adverse party to take advantage of an alleged error on appeal where it could easily have been corrected at trial. [Citations.]' [Citation.]" (*Cabrini Villas Homeowners Assn. v. Haghverdian* (2003) 111 Cal.App.4th 683, 693 [4 Cal.Rptr.3d 192].) In a written opposition to Bondo's motion DiPirro presented his objections to any denial of his right to a jury trial. Based upon DiPirro's opposition, both Bondo and the trial court were aware of the precise grounds for his challenge to the proposed ruling. After the tentative decision was issued, a repetition of the same opposition at the hearing on the motion was not required to preserve the issue on appeal. No forfeiture of the issue resulted. DiPirro neither waived the right to a jury trial nor forfeited the right to assert error in this appeal.

B. *DiPirro's Right to a Jury Trial of the Exposure Exemption Issues.*

We turn to DiPirro's claim of entitlement to a jury trial of Bondo's warning exemption defense found in section 25249.10, subdivision (c). The Act (§§ 25249.5–25249.13) does not grant any statutory right to a jury trial in enforcement actions, so DiPirro must rely on the right to jury trial provided by article I, section 16 of the California Constitution. Code of Civil Procedure section 592 also specifically provides that "In actions for the recovery of specific, real, or personal property, with or without damages, or for money claimed as due upon contract, or as damages for breach of contract, or for injuries, an issue of fact must be tried by a jury, unless a jury trial is waived . . . ."

"Where the action is one at law, there is a right to a jury trial." (*Van de Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 863 [251 Cal.Rptr. 530].) "But the right applies only to a civil action as it existed at common law in 1850, when our Constitution was adopted. [Citation.] There is no right to a jury trial in an action in equity." (*Baugh v. Garl* (2006) 137 Cal.App.4th 737, 740 [40 Cal.Rptr.3d 539].) " 'It is the right to trial by jury as it existed at common law which is preserved; and what that right is, is a purely historical question, a fact which is to be ascertained like any other social, political or legal fact.' [Citation.]" (*Wisden v. Superior Court* (2004) 124 Cal.App.4th 750, 754 [21 Cal.Rptr.3d 523].) "If the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties

Cal.4th 367, 371 [58 Cal.Rptr.2d 458, 926 P.2d 438]; *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093].)

are not entitled to a jury trial." (*American Motorists Ins. Co. v. Superior Court* (1998) 68 Cal.App.4th 864, 871 [80 Cal.Rptr.2d 621], citing *C & K Engineering Contractors v. Amber Steel Co.* (1978) 23 Cal.3d 1, 9 [151 Cal.Rptr. 323, 587 P.2d 1136].)

■ " ' " " 'If the action has to deal with ordinary common-law rights cognizable in courts of law, it is to that extent an action at law. In determining whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case—the *gist* of the action. A jury trial must be granted where the *gist* of the action is legal, where the action is in reality cognizable at law.' " [Citation.] On the other hand, if the action is essentially one in equity and the relief sought "depends upon the application of equitable doctrines," the parties are not entitled to a jury trial.' [Citation.]" (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 23–24 [24 Cal.Rptr.3d 233]; see also *Baugh v. Garl, supra,* 137 Cal.App.4th 737, 740.)

" 'Although . . . "the legal or equitable nature of a cause of action ordinarily is determined by the mode of relief to be afforded" [citation], the prayer for relief in a particular case is not conclusive [citations]. . . .' [Citation.]" (*Walton v. Walton* (1995) 31 Cal.App.4th 277, 287 [36 Cal.Rptr.2d 901].) "Analysis begins, as the California Supreme Court has instructed, with the historical analysis, not with the pleadings; 'the court is not bound by the form of the action but rather by the nature of the rights involved and the facts of the particular case . . . .' [Citation.]" (*Wisden v. Superior Court, supra,* 124 Cal.App.4th 750, 757.) "The issue whether [DiPirro] was constitutionally entitled to a jury trial" is a "pure question of law that we review de novo." (*Caira v. Offner, supra,* 126 Cal.App.4th 12, 23.)

■ We begin our analysis with the obvious point that a statutory enforcement action under the Act is not one that existed under common law in 1850. That, of course, is not the end of the inquiry. "[T]he right to a jury trial does not entirely depend upon the existence of a particular right of action in 1850. [Citation.] Rather, it exists when a current case is of the same 'class' or 'nature' as one which existed in 1850." (*Jefferson v. County of Kern* (2002) 98 Cal.App.4th 606, 613–614 [120 Cal.Rptr.2d 1]; see also *Asare v. Hartford Fire Ins. Co.* (1991) 1 Cal.App.4th 856, 867 [2 Cal.Rptr.2d 452].) "[T]he fact that the particular statute or offense was not in existence when the Constitution was adopted is not determinative; if the same type or class" of action "called for a jury trial, the right is carried over to the new statute." (*People v. Anderson* (1987) 191 Cal.App.3d 207, 219 [236 Cal.Rptr. 329].) A statute that " ' "was enacted since the adoption of the Constitution" ' " is not for that reason outside the scope of " ' "the guaranty of trial by jury. ■ The constitutional right of trial by jury is not to be narrowly construed. It is not

limited strictly to those cases in which it existed before the adoption of the Constitution but is extended to cases of like nature as may afterwards arise. It embraces cases of the same class thereafter arising. . . . The introduction of a new subject into a class renders it amenable to its general rules, not to its exceptions." ' [Citation.]" (*Jefferson v. County of Kern, supra*, at p. 614, italics omitted.) The right to trial by jury is not inapplicable to causes of action based on statutes, but applies to actions enforcing statutory rights "if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." (*Curtis v. Loether* (1974) 415 U.S. 189, 194 [39 L.Ed.2d 260, 94 S.Ct. 1005].) Where, as here, we are deciding if a jury trial is required and have been presented with a statutory scheme that was not known at common law in 1850, as with any other action we look to the essence of the rights conferred and the relief sought—" 'the "gist of the action." If the "gist" is legal, as opposed to equitable, we have recognized a right to jury trial. [Citations.]' [Citation.]" (*Asare v. Hartford Fire Ins. Co., supra*, at p. 867.) We thus first " 'compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity,' " and then " 'examine the remedy sought and determine whether it is legal or equitable in nature.' " (*Granfinanciera, S. A. v. Nordberg* (1989) 492 U.S. 33, 42 [106 L.Ed.2d 26, 109 S.Ct. 2782], quoting *Tull v. United States* (1987) 481 U.S. 412, 417–418 [95 L.Ed.2d 365, 107 S.Ct. 1831].)

 We thus proceed to examine the statutory scheme to determine the "gist of the action" pursued by DiPirro. While an action under the Act does not directly implicate specific, recognized equitable doctrines, the statutory scheme embodied in the Act is itself thoroughly infused with equitable principles that must be considered and adjudicated in an enforcement action. The essential character and purpose of the Act is equitable. Proposition 65 is " 'a remedial statute intended to protect the public,' " which seeks to prevent contamination of sources of drinking water and requires "businesses to warn individuals about carcinogens and reproductive toxins to which they are exposed through consumer transactions, employment, and the environment."[19] (*Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 461–462, [110 Cal.Rptr.2d 627].)

---

[19] To reinforce the remedial and equitable nature of the Act, section 1 of Proposition 65 states: "The people of California find that hazardous chemicals pose a serious potential threat to their health and well-being, that state government agencies have failed to provide them with adequate protection, and that these failures have been serious enough to lead to investigations by federal agencies of the administration of California's toxic protection programs. The people therefore declare their rights: [¶] (a) To protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm. [¶] (b) To be informed about exposures to chemicals that cause cancer, birth defects, or other reproductive harm. [¶] (c) To secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten public health and safety. [¶] (d) To shift the cost of hazardous waste cleanups

■ The foremost consideration before us is that the *remedies* sought through an enforcement action under the Act are equitable in nature. "Determining whether the gist of a claim is in law or equity 'depends in large measure upon the mode of relief to be afforded.' [Citation.]" (*Asare v. Hartford Fire Ins. Co., supra,* 1 Cal.App.4th 856, 867; see also *Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 697 [59 Cal.Rptr.2d 303].) An action that seeks to enforce the consequences of the listing of a chemical fundamentally seeks a form of declaratory relief—that the product requires a warning under the Act—which is equitable in nature and does not carry with it the guarantees of a jury trial. (See *Andal v. City of Stockton* (2006) 137 Cal.App.4th 86, 91 [40 Cal.Rptr.3d 34]; *Caira v. Offner, supra,* 126 Cal.App.4th 12, 26–27; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1241 [19 Cal.Rptr.3d 416]; *Baxter Healthcare Corp. v. Denton, supra,* 120 Cal.App.4th 333, 357–358.)

■ As the Act specifically authorizes in section 25249.7, DiPirro requested in his complaint both injunctive relief to prevent the sale of Bondo's product and civil penalties against Bondo.[20] Injunctive relief is invariably an

---

more onto offenders and less onto law-abiding taxpayers." (Ballot Pamp., Gen. Elec. (Nov. 4, 1986) text of Prop. 65, § 1, p. 53, reprinted in Historical and Statutory Notes, 40E West's Ann. Health & Saf. Code (2006 ed.) foll. § 25249.5, p. 322.)

[20] DiPirro also requested "appropriate restitution to individuals in the state of California," but that remedy is not specified in the Act and is really subsumed within the liability for civil penalties. Section 25249.7 provides in part: "(a) Any person that violates or threatens to violate Section 25249.5 or 25249.6 may be enjoined in any court of competent jurisdiction.

"(b)(1) Any person who has violated Section 25249.5 or 25249.6 shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) per day for each violation in addition to any other penalty established by law. That civil penalty may be assessed and recovered in a civil action brought in any court of competent jurisdiction. [¶] (2) In assessing the amount of a civil penalty for a violation of this chapter, the court shall consider all of the following: [¶] (A) The nature and extent of the violation. [¶] (B) The number of, and severity of, the violations. [¶] (C) The economic effect of the penalty on the violator. [¶] (D) Whether the violator took good faith measures to comply with this chapter and the time these measures were taken. [¶] (E) The willfulness of the violator's misconduct. [¶] (F) The deterrent effect that the imposition of the penalty would have on both the violator and the regulated community as a whole. [¶] (G) Any other factor that justice may require.

"(c) Actions pursuant to this section may be brought by the Attorney General in the name of the people of the State of California, by any district attorney, by any city attorney of a city having a population in excess of 750,000, or, with the consent of the district attorney, by a city prosecutor in any city or city and county having a full-time city prosecutor, or as provided in subdivision (d).

"(d) Actions pursuant to this section may be brought by any person in the public interest if both of the following requirements are met: [¶] (1) The private action is commenced more than 60 days from the date that the person has given notice of an alleged violation of Section 25249.5 or 25249.6 that is the subject of the private action to the Attorney General and the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator. If the notice alleges a violation of Section 25249.6, the notice of the alleged violation shall include a certificate of merit executed by the attorney

equitable remedy, and a demand for civil penalties does not in itself require a jury trial. (See *Kwan v. Mercedes-Benz of North America, Inc.* (1994) 23 Cal.App.4th 174, 184 [28 Cal.Rptr.2d 371].) ■ " ' "The fact that damages is one of a full range of possible remedies does not guarantee . . . the right to a jury . . . ." ' [Citation.]" (*Caira v. Offner, supra,* 126 Cal.App.4th 12, 24; see also *Baugh v. Garl, supra,* 137 Cal.App.4th 737, 741.) ■ We recognize "the 'general rule' " that monetary relief is a legal remedy, "and an award of statutory damages may serve purposes traditionally associated with legal relief, such as compensation and punishment." (*Feltner v. Columbia Pictures Television, Inc.* (1998) 523 U.S. 340, 352 [140 L.Ed.2d 438, 118 S.Ct. 1279].) However, " '[a]n action is one in equity where the only manner in which the legal remedy of damages is available is by application of equitable principles.' [Citation.]" (*Interactive Multimedia Artists, Inc. v. Superior Court* (1998) 62 Cal.App.4th 1546, 1555 [73 Cal.Rptr.2d 462]; see also *Asare v. Hartford Fire Ins. Co., supra,* 1 Cal.App.4th 856, 867; *Van de Kamp v. Bank of America, supra,* 204 Cal.App.3d 819, 865.) ■ Damages sought in the nature of civil penalties for violations of the Act are assessed upon consideration of articulated factors that do not primarily take into account any harm suffered by the plaintiff.[21] (§ 25249.7, subd. (b)(2).) Where, as here, the statute has delegated the assessment of civil penalties in accordance with a highly discretionary calculation that takes into account multiple factors, this is the kind of calculation traditionally performed by judges rather than a jury, and does not require a jury trial for that purpose in a civil action. (See *Tull v. United States, supra,* 481 U.S. 412, 427.)

■ The Act is informational and preventative rather than compensatory in its nature and function. The statutory damages available under the Act in

---

for the noticing party, or by the noticing party, if the noticing party is not represented by an attorney. The certificate of merit shall state that the person executing the certificate has consulted with one or more persons with relevant and appropriate experience or expertise who has reviewed facts, studies, or other data regarding the exposure to the listed chemical that is the subject of the action, and that, based on that information, the person executing the certificate believes there is a reasonable and meritorious case for the private action. Factual information sufficient to establish the basis of the certificate of merit, including the information identified in paragraph (2) of subdivision (h), shall be attached to the certificate of merit that is served on the Attorney General. [¶] (2) Neither the Attorney General, any district attorney, any city attorney, nor any prosecutor has commenced and is diligently prosecuting an action against the violation."

[21] Indeed, nothing indicates that DiPirro *personally* suffered any harm due to exposure to Bondo's product. Since "there are no reports of reproductive toxicity in males with the exception of a single case," any proof of *his* actual damages in this case would be quite problematic.

the nature of civil penalties do not grow out of a claim for moneys due and owing or for personal harm or property damages that have resulted from discharge of pollutants or other toxic chemicals, which are actions triable by a jury at common law. (Cf. *Tull v. United States, supra,* 481 U.S. 412, 417–422 (*Tull*);[22] *Wisden v. Superior Court, supra,* 124 Cal.App.4th 750, 758–760; *Grossblatt v. Wright* (1951) 108 Cal.App.2d 475, 485–486 [239 P.2d 19].) Rather, Proposition 65 is distinguishable in its fundamentally equitable purpose and remedy: to facilitate the *notification* of the public of potentially harmful substances, so informed decisions may be made by consumers on the basis of disclosure. ▄▄▄ "Citizens bringing [Proposition 65] suits need not plead a private injury and instead are deemed to sue 'in the public interest.' [Citation.]" (*National Paint & Coatings Assn. v. State of California* (1997) 58 Cal.App.4th 753, 757 [68 Cal.Rptr.2d 360].) An award of civil penalties under the Act is a statutory punitive exaction determined on the basis of equitable principles, designed to deter misconduct and harm, not to compensate the plaintiff for actual damages sustained.[23] (See *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937]; *Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 977 [132 Cal.Rptr.2d 635]; *Day v. A T & T Corp.* (1998) 63 Cal.App.4th 325, 338 [74 Cal.Rptr.2d 55]; *Kwan v. Mercedes-Benz of North America, Inc., supra,* 23 Cal.App.4th 174, 184; *Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 226–228 [220 Cal.Rptr. 712].) The primary right to bring an action for civil penalties pursuant to the Act is also given to the state rather than individuals seeking compensation. (§ 25249.7, subd. (c).)

---

[22] *Tull* was an action instituted by the federal government against the petitioner, a real estate developer, seeking an injunction and civil penalties for unlawfully dumping fill on wetlands in violation of the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), commonly known as the Clean Water Act, which, along with its California counterpart, the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.), prohibits the discharge of any pollutant except in compliance with one of several statutory exceptions, and requires individual polluters to minimize effluent discharge. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619–620 [26 Cal.Rptr.3d 304, 108 P.3d 862].) The developer in *Tull* had sold nearly all of the property, so effective injunctive relief was unavailable. (*Tull, supra,* 481 U.S. 412, 415, 424–425.) The United States Supreme Court found that imposition of a civil penalty under the Clean Water Act in the circumstances presented was a type of legal remedy analogous to the 18th-century action in debt, and thus the petitioner had a constitutional right to a jury trial to determine his *liability* on the legal claim and all issues common to both claims. (*Tull,* at pp. 419–420, 425.) The court also concluded, however, that the "determination of a civil penalty is not an essential function of a jury trial," and therefore "the trial court and not the jury should determine the amount of penalty, if any." (*Id.,* at pp. 426–427.)

[23] We realize that a specified percentage of the civil penalties imposed upon a defendant in a Proposition 65 case is awarded to a private litigant who brings the action, but the award need not be based on any actual damages suffered by the plaintiff.

Moreover, the Act does not have a standing requirement; a plaintiff need not allege or prove damages to maintain an action under Proposition 65. As such, the statutory remedies afforded by the Act, including civil penalties, are not damages at law, but instead constitute equitable relief appropriate and incidental to enforcement of the Act, which do not entitle the plaintiff to a jury trial. (See *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 382 [261 Cal.Rptr. 318, 777 P.2d 91]; *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1383, 1392–1393 [1 Cal.Rptr.2d 446].) The "incidental award of monetary damages by a court in the exercise of its equitable jurisdiction does not convert the proceeding into a legal action." (*Snelson v. Ondulando Highlands Corp.* (1970) 5 Cal.App.3d 243, 259 [84 Cal.Rptr. 800].)

Finally, even without consideration of the specific *remedies* provided in section 25249.7, we conclude that the *gist* of DiPirro's statutory enforcement action given recognition and implementation in the Act is to enjoin or prevent the knowing distribution, sale and use of products with listed dangerous chemicals, *unless the requisite warnings are provided.* (See *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 918 [12 Cal.Rptr.3d 262, 88 P.3d 1]; *Baxter Healthcare Corp. v. Denton, supra,* 120 Cal.App.4th 333, 355.) Although DiPirro could not have pursued this particular statutory action under the Act in 1850, the bulk of the relief sought here was cognizable at common law as an equitable action to abate a public nuisance. (See *Arciero Ranches v. Meza* (1993) 17 Cal.App.4th 114, 124–125 [21 Cal.Rptr.2d 127]; *Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 353–354 [235 Cal.Rptr. 422].) "The essence of an action to abate a public nuisance and for injunctive relief is equitable and there is no right to a jury trial." (*People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1245 [106 Cal.Rptr.2d 738]; see also *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1102 [60 Cal.Rptr.2d 277, 929 P.2d 596]; *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 310 [40 Cal.Rptr.3d 313]; *People v. Pacific Landmark, LLC* (2005) 129 Cal.App.4th 1203, 1211 [29 Cal.Rptr.3d 193].) DiPirro is not entitled to a jury trial on his enforcement action in equity under section 25249.7. (*Stell v. Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1220 [15 Cal.Rptr.2d 220]; see *Van de Kamp v. Bank of America, supra,* 204 Cal.App.3d 819, 865; *Wolford v. Thomas, supra,* at p. 354.)

We further conclude that the trial court's bifurcation of the proceeding and separate initial adjudication of Bondo's warning exemption defense did not transform the case into an action at law or require a jury trial. We acknowledge the rule that the right to a jury trial may not be abrogated by the

trial court's severance of equitable claims from legal claims that have been joined in the same action. (*Walton v. Walton, supra,* 31 Cal.App.4th 277, 292; *Selby Constructors v. McCarthy* (1979) 91 Cal.App.3d 517, 527 [154 Cal.Rptr. 164].) Where a "mixed bag" of legal and equitable claims is presented in a case, a court trial of the equitable claims first may obviate the necessity of a jury trial on the legal claims, but otherwise the plaintiff cannot be denied the right to a jury trial on the legal causes of action. (*Nwosu v. Uba, supra,* 122 Cal.App.4th 1229, 1238; see also *Jefferson v. County of Kern, supra,* 98 Cal.App.4th 606, 619–620; *Van de Kamp v. Bank of America, supra,* 204 Cal.App.3d 819, 863.) If "there are equitable and legal remedies sought in the same action, the parties are entitled to have a jury determine the legal issues unless the trial court's initial determination of the equitable issues is also dispositive of the legal issues, leaving nothing to be tried by a jury." (*American Motorists Ins. Co. v. Superior Court, supra,* 68 Cal.App.4th 864, 871, italics omitted.)

But here, Bondo's warning exemption defense was not a separate legal claim or cause of action, nor was the trial a special proceeding that engendered its own right to a jury trial. (See *Cornette v. Department of Transportation* (2001) 26 Cal.4th 63, 76–77 [109 Cal.Rptr.2d 1, 26 P.3d 332].) It was just what it purported to be, an affirmative defense to the primary and singular equitable action brought by DiPirro under the Act. "An action 'is an ordinary proceeding in a court of justice by which one party prosecutes another for the declaration, enforcement, or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense.' [Citation.]" (*Cornette, supra,* at p. 76; see also *Jefferson v. County of Kern, supra,* 98 Cal.App.4th 606, 616.) For purposes of deciding the right to a jury trial, the action in the present case is DiPirro's claim brought under the Act; the warning exemption defense is merely an affirmative defense within that action. (*Jefferson v. County of Kern, supra,* at p. 617.) " '[A] "defense" is "[t]hat which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks[; . . . [¶] it is a] response to the claims of the other party, setting forth reasons why the claims should not be granted." [Citation.]' [Citation.] That the common meaning of 'action'—as in an 'action to enforce'—does not include procedural steps such as a demurrer or other defenses is illustrated by the following passage in an authoritative work: 'The broad definition [of action] covers the following: (1) suits at law or in equity. [Citation.] (2) Certain adversary proceedings that take place during a probate proceeding. [Citation.] (3) Actions for declaratory relief. [Citations.] (4) Actions for divorce (dissolution of marriage). [Citation.]' (3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 11, pp. 64–65.) There is nothing in this passage to suggest that a defensive matter . . . is included in

the term 'action.' " (*Salawy v. Ocean Towers Housing Corp.* (2004) 121 Cal.App.4th 664, 673 [17 Cal.Rptr.3d 427], italics omitted.)

█ And even though issues of fact would be resolved in the adjudication of the warning exemption defense asserted under the Act, there is no "jury trial right on affirmative defenses that can be tried separately and first." (*Windsor Square Homeowners Assn. v. Citation Homes* (1997) 54 Cal.App.4th 547, 558 [62 Cal.Rptr.2d 818]; see also *Jefferson v. County of Kern, supra*, 98 Cal.App.4th 606, 616–617.) No "California authority . . . stands directly or indirectly for the proposition that there is such a jury trial right. All the authority we have discovered and exhaustively described, assumes, *without much analytical discussion*, that such factual issues are naturally tried to the court." (*Windsor Square Homeowners Assn. v. Citation Homes, supra*, at p. 558.) We therefore conclude that the trial court did not err by granting the motion to strike DiPirro's demand for a jury trial and proceeding to adjudicate the equitable action without a jury. (*People v. Englebrecht, supra*, 88 Cal.App.4th 1236, 1246; *Wolford v. Thomas, supra*, 190 Cal.App.3d 347, 354.)[24]

## II. *The Trial Court's Finding of a Warning Exemption Under Section 25249.10.*

We proceed to DiPirro's challenge to the trial court's finding that Bondo established the warning exemption of section 25249.10, subdivision (c). DiPirro argues that the trial court did not follow the "proper standards" in undertaking the assessment of the warning exemption evidence. He has two essential complaints with the trial court's evaluation of the warning exemption evidence. First, he insists that a defendant seeking to prove the warning exemption under the Act "must show that *no consumer* using the product in a reasonably foreseeable manner will be exposed to levels of toxins above" the MADL. (Italics added.) The issue was in dispute at trial, and the court settled upon a model "that captures the 75th to 85th percentile" of the population rather than the no-consumer level. Second, DiPirro maintains that the MADL must be calculated on a per day basis, not averaged over a nine-month gestational period. He recognizes that the trial court did not reach this issue, but asks us to "resolve it as well" to apprise the trial court on remand of the rule that "the MADL is just what it says: a daily limit."

█ As a necessary prelude to our review of the trial court's finding on the warning exemption defense, we provide a recitation of some of the pertinent provisions of Proposition 65. Section 25249.8, subdivision (a),

---

[24] DiPirro has directed our attention to cases brought under the Act that have been tried by juries rather than the courts. We observe that trial of a case before a jury is not equivalent to the right to a jury trial.

requires the Governor of the State of California to "cause to be published a list of those chemicals known to the state to cause cancer or reproductive toxicity within the meaning of this chapter, and he shall cause such list to be revised and republished in light of additional knowledge at least once per year thereafter." The list of known carcinogens and teratogens must be published and updated annually. (*Mateel Environmental Justice Foundation v. Edmund A. Gray Co.* (2003) 115 Cal.App.4th 8, 18 [9 Cal.Rptr.3d 486].) Section 25249.8, subdivision (b), states that "A chemical is known to the state to cause cancer or reproductive toxicity within the meaning of this chapter if in the opinion of the state's qualified experts it has been clearly shown through scientifically valid testing according to generally accepted principles to cause cancer or reproductive toxicity, or if a body considered to be authoritative by such experts has formally identified it as causing cancer or reproductive toxicity, or if an agency of the state or federal government has formally required it to be labeled or identified as causing cancer or reproductive toxicity." The list of chemicals known to the state to cause reproductive developmental toxicity is found at section 12000 in title 22 of the California Code of Regulations, and as the parties agree, it contains toluene.

 Once a chemical such as toluene is listed as a reproductive toxin, section 25249.6 "prohibits the knowing and intentional exposure of any person to a cancer-causing chemical without first providing a warning, except as provided in section 25249.10." (*Consumer Cause, Inc. v. Weider Nutrition Internat., Inc., supra*, 92 Cal.App.4th 363, 365; see also *DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 969–970 [14 Cal.Rptr.3d 787].) "[S]ection 25249.6 places the duty to give a clear and reasonable warning upon any person who in the course of doing business knowingly and intentionally exposes another person to a chemical determined by the state to cause cancer or reproductive toxicity." (*Environmental Law Foundation v. Wykle Research, Inc.* (2005) 134 Cal.App.4th 60, 67 [35 Cal.Rptr.3d 788].)

However, the "Act's warning requirement (§ 25249.6) is subject to statutory exemptions, one of which applies to '[a]n exposure for which the person responsible can show that the exposure . . . will have no observable effect assuming exposure at one thousand (1,000) times the level in question for substances known to the state to cause reproductive toxicity . . . .' (§ 25249.10, subd. (c), . . . (hereafter exposure exemption).)" (*Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th 454, 463, italics omitted.)[25] The defendant has the burden to establish that the exposure meets the criteria of this exemption. (*Consumer Defense Group v. Rental Housing Industry Members* (2006) 137 Cal.App.4th 1185, 1214 [40 Cal.Rptr.3d 832]; see also *Consumer Cause, Inc. v. SmileCare, supra*, at pp. 463–464.)

---

[25] The "level in question" is defined in the regulations as "the chemical concentration of a listed chemical for the exposure in question." (Cal. Code Regs., tit. 22, § 12821, subd. (a).)

■ According to regulations promulgated by the Office of Environmental Health Hazard Assessment,[26] a defendant may establish the warning exemption "by providing specified data about the effect of a reproductive toxin. In particular, a defendant must establish: (1) the 'no observable effect level,' or 'NOEL,' which is the 'maximum dose level at which a chemical has no observable reproductive effect' (Cal. Code Regs., tit[.] 22, § 12801, subd. (c)); and (2) the level of exposure in question." (*Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th 454, 464.)[27] The standard of proof required of the defendant to establish the warning exemption is "the preponderance of the evidence standard." (*Baxter Healthcare Corp. v. Denton, supra*, 120 Cal.App.4th 333, 368.) The " 'level in question' must be one thousand times less than the level which would produce no observable effect." (OEHHA, Final Statement of Reasons: Article 8 (June 1989) pp. 82–83; see Cal. Code Regs., tit. 22, § 12821, Level of Exposure to Chemicals Causing Reproductive Toxicity.) "A defendant is exempt from warning others about a reproductive toxin if the level of exposure in question is 1,000 times below the NOEL." (*Consumer Cause, Inc. v. SmileCare, supra*, at p. 465.) Thus, Bondo's burden was to first prove the NOEL for exposure to toluene, then ultimately prove that the level of exposure of its touch-up paint is "1,000 times below the NOEL. (§ 25249.10, subd. (c); Cal. Code Regs., tit. 22, §§ 12801, subds. (a), (b)(1), (c), 12803.)" (*Id.*, at p. 469.) This threshold warning exemption level of 1,000 times below the NOEL is referred to as the maximum allowable dose level, or MADL. (Cal. Code Regs., tit. 22, §§ 12801, subds. (b)(1), (c), 12805.) To state the distinction another way, the MADL is set as one one-thousandth of the NOEL.

■ "The calculation of the NOEL involves a highly technical, scientific inquiry. 'The determination of whether a level of exposure to a chemical known to the state to cause reproductive toxicity has no observable effect [at 1,000 times the level in question] shall be based on evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of a chemical as known to the state to cause reproductive toxicity.' [Citation.] While other evidence and standards are permitted [citation], a defendant must still perform a 'quantitative risk assessment' regardless of the type of evidence or standard used [citations]." (*Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th 454, 464.)

---

[26] The Act is enforced in accordance with regulations promulgated by the Office of Environmental Health Hazard Assessment (OEHHA), the primary agency that implements the Act. (See *Cal. Code Regs.*, tit. 22, §§ 12301, 12302, 12305; *id.*, appen. A., foll. § 12903.)

[27] Section 12801, subdivision (c) of the California Code of Regulations, title 22, provides: "For purposes of this article, 'NOEL' shall mean that no observable effect level, which is the maximum dose level at which a chemical has no observable reproductive effect."

"A quantitative risk assessment determines the maximum dose level having no observable reproductive effect, assuming an exposure 1,000 times the level in question. [Citations.] The assessment has to be based on studies producing the reproductive effect that provided the basis for listing the substance as a reproductive toxin in the first place. [Citation.] The NOEL must be the highest dose level that results in no observable reproductive effect. [Citation.] The quality and suitability of any epidemiological data must be examined in deciding whether the data is appropriate. [Citation.] Any comparative animal studies must satisfy generally accepted scientific principles." (*Consumer Cause, Inc. v. SmileCare, supra,* 91 Cal.App.4th 454, 464.)

■■■ " 'The exposure in question includes the exposure for which the person in the course of doing business is responsible . . . .' [Citation.] The level of exposure to a reproductive toxin 'shall be determined by multiplying the level in question (stated in terms of a concentration of a chemical in a given medium) times the reasonably anticipated rate of exposure for an individual to a given medium. The reasonably anticipated rate of exposure shall be based on the pattern and duration of exposure that is relevant to the reproductive effect which provided the basis for the determination that a chemical is known to the state to cause reproductive toxicity.' [Citation.] [¶] 'For exposures to consumer products, the level of exposure shall be calculated using the reasonably anticipated rate of intake or exposure for average users of the consumer product, and not on a per capita basis for the general population. The rate of intake or exposure shall be based on data for use of a general category or categories of consumer products . . . .' [Citation.]" (*Consumer Cause, Inc. v. SmileCare, supra,* 91 Cal.App.4th 454, 464–465.)

Our review of the trial court's findings of fact on the warning exemption defense is constrained by the substantial evidence rule. "A trial court's findings of fact are reviewed to determine whether they are supported by substantial evidence." (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 447 [37 Cal.Rptr.3d 399].) "In reviewing the sufficiency of the evidence, we must consider all of the evidence in the light most favorable to the prevailing party, accept as true all the evidence and reasonable inferences therefrom that tend to establish the correctness of the trial court's findings and decision, and resolve every conflict in favor of the judgment. [Citation.] 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' [Citation.] [¶] 'We emphasize that the test is *not* the presence or absence of a substantial conflict in the evidence. Rather, it is simply whether there is substantial evidence in favor of the respondent. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld.' [Citations.]" (*Baxter*

*Healthcare Corp. v. Denton, supra,* 120 Cal.App.4th 333, 369; see also *Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1277 [48 Cal.Rptr.3d 715].)

A. *The Standards for Calculating the MADL of Exposure Under Section 25249.10.*

We first resolve DiPirro's claim that in determining the level of exposure within the meaning of section 25249.10, subdivision (c), the court erroneously settled upon a "percentage of the population" figure—in this case between 75 and 85 percent—that may use Bondo's touch-up paint product without exposure in excess of the MADL. DiPirro maintains that the statutory scheme must be interpreted to mean that if evidence shows "any portion of the population"—that is, essentially any consumer—may be exposed to levels of toluene above the MADL with use of the product in a "reasonably foreseeable manner," the warning exemption has not been established. He claims that the trial court's use of a percentile of the population as a standard for assessing exposure pursuant to section 25249.10, subdivision (c), is reversible error, as the evidence failed to prove "that no consumer who uses Bondo's touch-up paint in a reasonably foreseeable manner" was exposed to "levels of toluene above the MADL."[28]

The Act itself fails to delineate any precise standard for determining the extent of the population that must incur exposure below the MADL to establish the warning exemption of section 25249.10, subdivision (c). We are therefore called upon to interpret the statutory provisions of Proposition 65 "using the ordinary rules and canons of statutory construction. [Citation.] Thus, 'our primary purpose is to ascertain and effectuate the intent of the voters who passed the initiative measure. [Citations.]' [Citation.] We look first to the language of the statute, giving the words their ordinary meaning, and construing the statutory language in the context of the statute as a whole and the overall statutory scheme." (*Yeroushalmi v. Miramar Sheraton* (2001) 88 Cal.App.4th 738, 747–748 [106 Cal.Rptr.2d 332].) " 'Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language.' [Citation.]" (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 301 [58 Cal.Rptr.2d 855, 926 P.2d 1042]; see also *Consumer Advocacy Group, Inc. v. Exxon Mobil Corp.* (2002) 104 Cal.App.4th 438, 443–444 [128 Cal.Rptr.2d 454].) " 'We give the language its usual and ordinary meaning, and "[i]f there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language

---

[28] DiPirro adds that in "scientific parlance," the "no consumer" standard is "called a 'bounding study'—a study that demonstrates that no portion of the population is exposed to potentially harmful levels of toxins."

governs." . . . If, however, the statutory language is ambiguous, "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." . . . Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. . . . Any interpretation that would lead to absurd consequences is to be avoided.' [Citation.]" (*California State Employees' Assn. v. Board of Administration* (2003) 113 Cal.App.4th 137, 142 [5 Cal.Rptr.3d 922].) "The interpretation of statutes, as well as administrative regulations, presents questions of law subject to independent review on appeal." (*Gregory v. State Bd. of Control* (1999) 73 Cal.App.4th 584, 593 [86 Cal.Rptr.2d 575].)

 The "any consumer" standard proposed by DiPirro is an extreme one, particularly considering the already rigorous standard of proof required of a defendant to reach the safe harbor of the warning exemption defense. The NOEL for toluene is already the maximum dose level at which the chemical has no observable reproductive effect. (Cal. Code Regs., tit. 22, § 12801, subd. (c).) To establish the warning exemption defense, a defendant must additionally prove that the level of exposure caused by its product is 1,000 times below the NOEL. (§ 25249.10, subd. (c); Cal. Code Regs., tit. 22, §§ 12801, subds. (a), (b)(1), (c), 12803; *Consumer Cause, Inc. v. SmileCare, supra*, 91 Cal.App.4th 454, 469.) The burden imposed on a defendant by the Act to defend a warning action is thus quite onerous: proof of a "negligible, even microscopic 'exposure' " through a "full-scale scientific study to establish the amount of the carcinogen is so low that there is no need for a warning under Health and Safety Code section 25249.10." (*Consumer Defense Group v. Rental Housing Industry Members, supra*, 137 Cal.App.4th 1185, 1215.) Although we are bound to broadly construe Proposition 65 to effectuate its remedial purpose (*People ex rel. Lungren v. Superior Court, supra*, 14 Cal.4th 294, 314), given the already exceptional degree to which the warning exemption has gone to protect consumers, we are not persuaded to expand the definition of exposure to encompass a level 1,000 times below an observable effect upon *any person* that may result from an anomalous event or aberrant circumstance, at least not where statutes have failed to expressly do so.[29]

 When we consult the governing regulations, we are provided with some guidance in this matter that fails to support DiPirro's proposed stan-

---

[29] We also note that Proposition 65 was not intended to enact "an entirely one-sided public protection statute. The Act recognizes the interests of manufacturers and the users of needed chemicals," and seeks to balance the need for a warning of dangerous chemicals against the negative consequences that ensue from the decision to avoid use of a potentially beneficial product. (*Baxter Healthcare Corp. v. Denton, supra*, 120 Cal.App.4th 333, 366, 368.)

dard. The administrative construction of the governing laws through the promulgation of regulations by the OEHHA is " ' "entitled to great weight" ' " in determining what the Legislature intended when it enacted the statutory scheme in controversy. (*Snow v. Woodford* (2005) 128 Cal.App.4th 383, 394 [26 Cal.Rptr.3d 862].) However, " ' " 'whatever the force of administrative construction . . . final responsibility for the interpretation of the law rests with the courts.' [Citation.] . . ." ' [Citation.]" (*Ibid.*; see also *Coronado Yacht Club v. California Coastal Com.* (1993) 13 Cal.App.4th 860, 868 [17 Cal.Rptr.2d 10].) ■■ According to the regulations, the level of "exposure" to a reproductive toxin for purposes of the warning exemption is determined by "multiplying the level in question (stated in terms of a concentration of a chemical in a given medium) times the *reasonably anticipated rate of exposure for an individual* to a given medium. The reasonably anticipated rate of exposure shall be based on the pattern and duration of exposure that is relevant to the reproductive effect which provided the basis for the determination that a chemical is known to the state to cause reproductive toxicity." (Cal. Code Regs., tit. 22, § 12821, subd. (b), italics added.) A "reasonably anticipated" rate of exposure is not one that includes every conceivable consumer or use, but instead "will vary from case to case" and person to person. (OEHHA, Final Statement of Reasons: Article 8 (June 1989) p. 83; see Cal. Code Regs., tit. 22, § 12821, Level of Exposure to Chemicals Causing Reproductive Toxicity.)

■■ Further, subdivision (c)(2) of California Code of Regulations, title 22, section 12821 provides that for exposures to *consumer products* described in section 12601, subdivision (b), "the level of exposure shall be calculated using the reasonably anticipated rate of intake or exposure for *average users* of the consumer product, and not on a per capita basis for the general population." (Italics added.) While the reference to "average users" in section 12821 may indicate an intent to focus upon the "reasonably anticipated rate of consumption by the product user" rather than "per capita consumption of the general population"—many of whom will not use the product at all—we think the language of the regulation reasonably supports an interpretation that excludes at least some nonconforming or unusually high-intake consumers of a product when assessing exposure to consumer goods. (OEHHA, Final Statement of Reasons: Article 8 (June 1989) p. 84; see Cal. Code Regs., tit. 22, § 12821.) Subdivision (c) of section 12821 takes into account the factor that "[d]ifferent individuals take in different amounts" of a given medium of exposure, and by limiting the exposure assessment to "reasonably anticipated" use by "average consumers" seeks to deal with the "variability and fluctuation of the 'rate of exposure' " to resolve and avoid the concern with unreasonably requiring a "warning to all users of a product on the basis of

occasional high consumption." (OEHHA, Final Statement of Reasons: Article 8 (June 1989) pp. 84–85; see Cal. Code Regs., tit. 22, § 12821.)

The flexibility necessary to arrive at an appropriate exposure assessment is not provided by adhering to a standard that *invariably* requires the defendant to prove a level of exposure caused by its product that is 1,000 times below the NOEL for *every user*. Instead, we conclude that the statute envisions a case-by-case approach which takes into account the totality of the quantitative risk assessment evidence presented. For some products and some exposures—although probably very few—evidence of precise and uniform exposure may indicate that if "any consumer" is exposed to levels of toxins above the MADL with a "reasonably anticipated" use of the product, the warning exemption must be denied. In most other cases, the "average user" may incur exposure at a level appreciably below the most extreme level of exposure incurred by an atypical user.

In the present case, the evidence of the surveys and test results supports the trial court's finding that for purposes of the warning exemption the "average users of the consumer product" comprise less than the class of every consumer of Bondo's touch-up paint. If the survey data demonstrated anything, it is that the use of touch-up paint and the associated exposure to toluene is subject to significant disparity—in the total duration of use, the number and size of scratches or nicks painted, the number of coats applied, the amount of paint used, the nature of the area in which the paint is applied and the airflow in it. Use of touch-up paint by an appreciable fraction of consumers may fall well outside the average. Given the extreme variation in manner of use and extent of exposure, inclusion of all conceivable consumers in the determination of the allowable level of exposure to toluene from touch-up paint does not meet the governing standard of the "average users" of the product. We therefore find that in resolving the warning exemption defense the trial court did not err by failing to require proof from Bondo that "no consumer" who uses touch-up paint will suffer exposure to toluene above the MADL.

We further conclude that the "75th to 85th percentile" risk assessment test adopted by the trial court was appropriate and supported by the evidence. As the trial court recognized, the evidence presented by the parties of the results of their experts' surveys and studies does not lend itself to any precise, definitive statistical analysis or computation of toluene exposure for purposes of the warning exemption defense. Nevertheless, based upon evidence adduced in the case before us, Bondo's burden to prove that at least 75 to 85

percent of the consumers of touch-up paint do not receive a toluene exposure above the MADL complies with the mandate of section 25249.10, subdivision (c), and subdivision (c)(2) of section 12821 of the California Code of Regulations, to calculate the level of exposure using the reasonably anticipated rate of intake or exposure for average users of the consumer product. Dr. Lakin testified that the reference in Proposition 65 to the "reasonably anticipated exposure to an average person" means "a real person," not someone "outside the actual population" of users. He added that the EPA (Environmental Protection Agency) guidance documents used in Proposition 65 assessments, called the Exposure Assessment Guidance, address "high exposures" of the "theoretical bounding estimate," but nothing "above the *75th percentile* as being a reasonably anticipated or a typical or an average-type exposure." (Italics added.) Dr. Lakin's testimony was corroborated by the evidence of valid bounding studies or estimates that followed excessively conservative assumptions, variables and protocols designed to assess exposure at a "much higher level" than the "actual population" to safely calculate the "no risk" level even at the "upper end or extreme estimate of the population." In this case, the 75 to 85 percent standard corresponded to the evidence of appropriate bounding estimates and was properly protective of average consumers of touch-up paint.[30]

B. *The Evidence to Support the Trial Court's Finding That Bondo Established the Warning Exemption.*

We find support in the evidence offered by Bondo's experts for the trial court's determination of exposure that does not reach the MADL. The results of the 2003 Geomatrix Study by Dr. Embree established that toluene exposure from use of touch-up paint by average consumers was between 58 and 2,042 micrograms *per day*, or only 0.4 to 16 percent of the MADL of 13,000 micrograms. DiPirro presented evidence from Dr. Brown to contest the legitimacy of the protocols used in the 2003 Geomatrix Study, particularly the 0.4-liters-per-minute airflow rate that was double the NIOSH 1501 approved methodology. Dr. Brown also disapproved of the placement of the painted devices on the car, the breathing rate calculation, the sampling number, the lack of measurement of the volume of toluene or the amount of the paint, and other variables used in the 2003 Geomatrix Study.

---

[30] We realize that the OEHHA Final Statement of Reasons includes a reference to the "traditional" use of 95 percent confidence limits as "best estimates" in "regulatory toxicology" risk assessments. (OEHHA, Final Statement of Reasons: Article 7 (June 1989) p. 40; see Cal. Code Regs., tit. 22, § 12711.) We do not disagree with appellant that a 95 percent standard may be appropriate in some cases, but in the present case the trial court's adoption of a 75 to 85 percent standard is at least supported by substantial evidence.

Bondo offered expert testimony to rebut Dr. Brown's complaints, however, which was accepted by the trial court. For instance, Dr. Lakin explained that the deviation from the NIOSH 1501 airflow rate in the study did not compromise the results of the Geomatrix Study, given the use of second sampling tubes to account for any "blow-by" that resulted from the increased airflow. He also testified that failure to weigh the touch-up paint bottles before an application did not impair the validity of the study as long as the remaining methodology was acceptable. Further, many of the criticisms leveled at the 2003 Geomatrix Study were alleviated by the 2004 study, which modified the airflow rate—to the NIOSH 1501 figure—and other variables to more conservative levels, yet still achieved essentially the same results far below the MADL of 13,000 micrograms per day.

Dr. Lakin not only provided testimonial support for the Geomatrix Studies of Dr. Embree, but also performed his own EnSIGHT Study, which found that the reasonably anticipated exposure to toluene of the daily average use of touch-up paint is no more than 75 micrograms per day, unadjusted for exposure over the nine-month gestation period. While Dr. Lakin's reliance on the Nail Polish study and the Nossaman survey for his extrapolations may have been problematic, we still consider his ultimate findings to be valid bounding estimates, as did the trial court.

The trial court accepted the evidence offered by Bondo's experts and found that the 2003 and 2004 Geomatrix Studies were valid quantitative risk assessments based upon evidence and standards of comparable scientific validity to the evidence and standards which form the scientific basis for the listing of toluene. (Cal. Code Regs., tit. 22, § 12801, subd. (a).) While DiPirro presented evidence to the contrary, on appeal we cannot reweigh the evidence, and do not consider any of the testimony of Bondo's expert witnesses so inherently lacking in credibility as to be unworthy of consideration. The testimony of witnesses who were apparently believed by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions. (*People v. Jackson* (1992) 10 Cal.App.4th 13, 21 [12 Cal.Rptr.2d 541]; *In re Andrew I.* (1991) 230 Cal.App.3d 572, 578 [281 Cal.Rptr. 570]; *People v. Breault* (1990) 223 Cal.App.3d 125, 140–141 [273 Cal.Rptr. 110].) At most the record before us reveals the presentation of contrary evidence by DiPirro, which does not subject the testimony of Bondo's witnesses to repudiation or doubt. (*People v. Cantrell* (1992) 7 Cal.App.4th 523, 538 [9 Cal.Rptr.2d 188].)

Even Dr. Brown's Large Chamber study, which was accepted by the court as a "high end of what might reasonably be anticipated" in a bounding study, resulted in daily exposure results below the MADL: 2,991 micrograms per

day, or less than 25 percent of the MADL, without adjustment for the nine-month gestation period. Only his Small Chamber study of isolated, peak level exposure while painting produced the possibility of results above the MADL at various levels of touch-up paint use, and even Dr. Brown acknowledged that this study departed from realistic exposure parameters in many respects. In his testimony, Dr. Lakin effectively challenged the peak exposure assumption of Dr. Brown as inconsistent with Proposition 65, and the trial court rejected the Small Chamber study results as a bounding study. The only evidence that remotely contradicts the judgment was rejected by the trial court. Evidence "rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518].)

▊ We have been presented in this appeal with a classic case of conflicting evidence. We find in the record substantial evidence to support the finding that the daily exposure to toluene by average users of touch-up paint is below the MADL, and cannot disturb the judgment merely because conflicting evidence was also presented by DiPirro. Consequently, we need not resolve the issue addressed by the parties and the Attorney General concerning the propriety of averaging the exposure over the gestational period in determining the allowable exposure limit for toluene. The trial court did not reach this question and it is not our function to render an advisory opinion on this issue. (See *Coleman v. Department of Personnel Administration* (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300]; *Kuykendall v. State Bd. of Equalization* (1994) 22 Cal.App.4th 1194, 1207 [27 Cal.Rptr.2d 783].)

III. *The Denial of Bondo's Motion for Attorney Fees.*

Bondo has appealed from the trial court's denial of its request for attorney fees pursuant to Code of Civil Procedure section 1021.5. The trial court found that Bondo failed to establish "that its defense of the lawsuit against it resulted in the enforcement of an important right affecting the public interest." Bondo maintains that its successful defense of DiPirro's Proposition 65 action benefited not only "Bondo itself," but also "all users of automobile touch-up paint" who "will no longer be frightened or misled by utterly unnecessary 'warnings,'" the "general public" by discouraging "false and misleading warnings that dilute the effectiveness of Proposition 65 warnings," and automobile manufacturers and dealerships who will not be forced to endure similar suits. Bondo requests that we reverse the denial of the attorney fees award and remand the case to the trial court with directions to "determine the amount of attorneys' fees Bondo is entitled to recover."

 An award of attorney fees is appropriate, under the "private attorney general statute" when a litigant has been a successful party " 'in any action which has resulted in the enforcement of an important right affecting the public interest.' " (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 601–602 [57 Cal.Rptr.3d 215].) Code of Civil Procedure " ' "[s]ection 1021.5 codifies the 'private attorney general' doctrine under which attorney fees may be awarded to successful litigants." ' " (*Punsly v. Ho* (2003) 105 Cal.App.4th 102, 109 [129 Cal.Rptr.2d 89].) "Three basic criteria are required to support an award of attorneys' fees under section 1021.5: (1) the action resulted in the enforcement of an important right affecting the public interest; (2) a significant benefit was conferred on the general public or a large class of persons; and (3) the necessity and financial burden of private enforcement were such as to make the award appropriate." (*Abouab v. City and County of San Francisco* (2006) 141 Cal.App.4th 643, 663 [46 Cal.Rptr.3d 206]; see *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 511–512 [94 Cal.Rptr.2d 205].) " ' "The trial court is to assess the litigation realistically and determine from a practical perspective whether [the statutory] criteria have been met." [Citation.] . . .' [Citation.]" (*Lyons v. Chinese Hospital Assn.* (2006) 136 Cal.App.4th 1331, 1344 [39 Cal.Rptr.3d 550].)

"The doctrine is designed to encourage private enforcement of important public rights and to ensure aggrieved citizens have access to the judicial process where statutory or constitutional rights have been violated." (*Bell v. Vista Unified School Dist.* (2000) 82 Cal.App.4th 672, 690 [98 Cal.Rptr.2d 263].) "The private attorney general doctrine is based on the theory that 'privately initiated lawsuits are often essential to the effectuation of the fundamental public polices embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible.' [Citation.]" (*Abouab v. City and County of San Francisco, supra*, 141 Cal.App.4th 643, 663.)

The trial court found that Bondo failed to establish the first of the three Code of Civil Procedure section 1021.5 criteria: that the defense of the action resulted in the enforcement of an important right affecting the public interest.[31] " 'The decision as to whether an award of attorney fees is warranted rests initially with the trial court. . . . [¶] Where, as here, a trial court has discretionary power to decide an issue, its decision will be reversed only if there has been a prejudicial abuse of discretion.' [Citations.]" (*Abouab v. City and County of San Francisco, supra*, 141 Cal.App.4th 643, 660–661.) "[A]n

---

[31] We do not think that at least in the present case, the first criterion of an important right affecting the public interest can entirely be disassociated from the second: that the party thereby conferred a significant benefit on the general public or a large class of persons.

appellate court will decline to disturb the trial court's exercise of discretion, 'absent a showing that the court abused it—for example, where the record establishes there is no reasonable basis for the determination. [Citation.] In reviewing the trial court's decision, we must pay " 'particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision.' " [Citation.] "The pertinent question is whether the grounds given by the court for its denial of an award are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of th[e] case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute." [Citation.]' " (*Punsly v. Ho, supra*, 105 Cal.App.4th 102, 109.)

In our constrained review of the trial court's decision on the public interest element of Code of Civil Procedure section 1021.5, we have no disagreement with Bondo's hypothesis that unfounded warnings may be counterproductive or actually detrimental to consumers. " 'The problems of overwarning are exacerbated if warnings must be given even as to very remote risks . . . .' [Citation.] 'Against the benefits that may be gained by a warning must be balanced the dangers of overwarning and of less meaningful warnings crowding out necessary warnings, the problems of remote risks, and the seriousness of the possible harm to the consumer.' [Citation.]" (*Dowhal v. SmithKline Beecham Consumer Healthcare, supra*, 32 Cal.4th 910, 932.) Nor do we disagree with the assertion that as a result of the judgment in its favor some consumers may now more freely use Bondo's touch-up paint unconcerned with fears of exposure to excessive amounts of a chemical that causes reproductive toxicity. Automobile dealerships also received a benefit by avoiding possible litigation over toluene exposure through the use of touch-up paint.

And we agree with Bondo's position that under the proper circumstances attorney fees may be awarded to parties who successfully *defend* a public interest lawsuit. "Generally speaking, the opposing party liable for attorney fees under section 1021.5 has been the defendant person or agency sued, which is responsible for initiating and maintaining actions or policies that are deemed harmful to the public interest and that gave rise to the litigation." (*Connerly v. State Personnel Bd.* (2006) 37 Cal.4th 1169, 1176–1177 [39 Cal.Rptr.3d 788, 129 P.3d 1].) However, to effectuate the policy of providing substantial attorney fees to successful litigants in suits enforcing important public policies, the courts "have taken a broad, pragmatic view of what constitutes a 'successful party.' " (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 [21 Cal.Rptr.2d 331, 101 P.3d 140].) An "opposing party" against whom attorney fees may be awarded pursuant to Code of Civil Procedure section 1021.5 is defined broadly as "a party whose position in the litigation was adverse to that of the prevailing party. Simply

put, an 'opposing party' within the meaning of section 1021.5 is a losing party." (*Nestande v. Watson* (2003) 111 Cal.App.4th 232, 240–241 [4 Cal.Rptr.3d 18].) Thus, prevailing defendants are entitled to attorney fees upon a proper showing. (See *Hammond v. Agran* (2002) 99 Cal.App.4th 115, 136–137 [120 Cal.Rptr.2d 646]; *Hall v. Butte Home Health, Inc.* (1997) 60 Cal.App.4th 308, 323 [70 Cal.Rptr.2d 246].) "[S]ection 1021.5 draws no distinctions between plaintiffs and defendants as a 'successful party.' " (*Hull v. Rossi* (1993) 13 Cal.App.4th 1763, 1768 [17 Cal.Rptr.2d 457].) An award of attorney fees pursuant to section 1021.5 is available if a party defends an action " 'primarily to advance' " a public interest " 'rather than personal interests.' [Citation.]" (*Jobe v. City of Orange* (2001) 88 Cal.App.4th 412, 417 [105 Cal.Rptr.2d 782].)

The flaw in Bondo's claim to attorney fees under Code of Civil Procedure section 1021.5 is that the essence and fundamental outcome of its defense was the advancement of its own economic interests. Although the ultimate decision in the present case may have resulted in a determination advantageous—or at least reassuring—to potential consumers that touch-up paint does not contain sufficient quantities of toluene to require warnings, we are not persuaded that any greater benefit to the virtues of Proposition 65 was conferred by Bondo in the present case. The judgment that Proposition 65 warnings are not required on its touch-up paint tubes is a result that affects a limited class of consumers of that product. Bondo only prevented the placement of unnecessary warnings on its touch-up paint; any additional impact on other products or the overall statutory scheme is nebulous and speculative. Further, the benefit conferred upon automobile manufacturers or dealerships was certainly not significant to the general public or a large class of persons.

The primary focus of defendant's interest in the case was pecuniary: to avert the cost of placing warnings on its product and perhaps the consequential loss of potential customers, as well as to avoid the imposition of civil penalties. "[I]t has been repeatedly held that an award of attorney fees is not justified under section 1021.5 if the public benefit gained from the law suit (assuming arguendo there is such a benefit here) and the important public right enforced by the suit (assuming arguendo such a right was vindicated here) are coincidental" to the monetary or other personal gain realized by the party seeking fees. (*Pacific Mutual Life Ins. Co. v. State Bd. of Equalization* (1996) 41 Cal.App.4th 1153, 1165 [49 Cal.Rptr.2d 99].) "Because the public always has a significant interest in seeing that laws are enforced, it always derives some benefit when illegal private or public conduct is rectified. Nevertheless, the Legislature did not intend to authorize an award of fees under section 1021.5 in every lawsuit enforcing a constitutional or statutory right. [Citations.] The statute specifically provides for an award only when the lawsuit has conferred 'a significant benefit' on 'the general public or a

large class of persons.' The trial court must determine the significance of the benefit and the size of the class receiving that benefit by realistically assessing the gains that have resulted in a particular case." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 635 [71 Cal.Rptr.2d 632].)

 Our review of the record indicates to us that both the principal objective and consequence of the defense of the Proposition 65 lawsuit was to advance or vindicate Bondo's economic interests. Where the enforcement or advancement of any public interest with the defense of the action was secondary and incidental to achieving personal business goals, an award of fees under Code of Civil Procedure section 1021.5 is not warranted. (See *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 167 [188 Cal.Rptr. 104, 655 P.2d 306]; *Bell v. Vista Unified School Dist., supra,* 82 Cal.App.4th 672, 690–691; *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961, 968 [88 Cal.Rptr.2d 565]; *Flannery v. California Highway Patrol, supra,* 61 Cal.App.4th 629, 635; *California Common Cause v. Duffy* (1987) 200 Cal.App.3d 730, 750–751 [246 Cal.Rptr. 285]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 914 [223 Cal.Rptr. 379].) If we were to grant attorney fees to Bondo, prevailing defendants in nearly all cases brought under Proposition 65, despite the primary pursuit of their own interests, might be entitled to an award under section 1021.5, a result the statute does not countenance. (*Flannery v. California Highway Patrol, supra,* at p. 636.) We agree with the assertion in the amicus curiae brief of the Attorney General's Office that while an award of attorney fees to a successful defendant in a Proposition 65 case may be appropriate in limited circumstances where the public benefit is more obvious and substantial, those circumstances do not exist in the present case.[32] Code of Civil Procedure " '[s]ection 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest.' [Citation.]" (*Flannery, supra,* at p. 635.) We therefore conclude that the trial court did not abuse its discretion by denying an award of attorney fees based upon a finding that Bondo did not confer the requisite significant benefit upon the public. (*Jobe v. City of Orange, supra,* 88 Cal.App.4th 412, 417, 419; *Bell v. Vista Unified School Dist., supra,* at p. 691; *Pacific Mutual Life Ins. Co. v. State Bd. of Equalization, supra,* 41 Cal.App.4th 1153, 1165.)

---

[32] We also observe that defendants in spurious Proposition 65 actions may seek "imposition of sanctions under Code of Civil Procedure section 128.5, or other statutes providing for an award of reasonable expenses, including attorney fees, for frivolous, bad faith, or unmeritorious actions, motions or pleadings." (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 95 [38 Cal.Rptr.3d 528].)

## DISPOSITION

Accordingly, the judgment is affirmed. The parties are to bear their own costs on appeal.

Stein, Acting P. J., and Margulies, J., concurred.

On August 8, 2007, the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied October 24, 2007, S155567. Kennard, J., Chin, J., and Moreno, J., were of the opinion that the petitions should be granted.